## Case No. 16,589a.
### UNITED STATES v. TWO THOUSAND FOUR HUNDRED AND NINETEEN SHEEPSKINS.

[2 Hask. 394.] [1]

District Court, D. Maine. April, 1880.

SMUGGLING — MIXTURE OF SMUGGLED WITH INNOCENT GOODS—FORFEITURES.

1. Merchandise subject to duty, mixed with other goods upon which the duties have been paid at an earlier place of entry, imported by vessel without invoice and consular certificate and without entry on the manifest, under the false pretence, that the duties on it have also been paid, and that it was protected as in transit by the same manifest, persisted in until the fraud is discovered, when the duties are tendered, subject to seizure and forfeiture under the revenue laws.

2. Such merchandise on board a foreign vessel at a wharf in Eastport, Maine, is imported into this country so as to become subject to our laws; and for their violation the same may be there seized.

3. Those packages only in which the goods intended to be smuggled were contained are liable to forfeiture and not the whole invoice. These are not so liable unless the court is satisfied that there was an intent to defraud by importing them; nor then, if the officers, after seizure, have distributed the goods so that it cannot be told in what packages the goods intended to be smuggled were placed.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

In admiralty. Libel in rem against merchandise seized for violation of the revenue laws. Josephus M. Murchie appeared and claimed the property, and answered denying any illegal importation and any intent to defraud the revenue.

Wilber F. Lunt, U. S. Dist. Atty.

Frederick A. Pike and George F. Talbot, for claimant.

FOX, District Judge. This merchandise was seized by the collector of customs in the Passamaquoddy district at Eastport, on navigable waters on January 5, 1880, for alleged violations of the customs laws, and the present libel has been instituted that the same may be declared forfeited. Josephus M. Murchie, a trader of St. Stephens. in New Brunswick, is the claimant of all said merchandise, and in his answer denies all violation of law in the importation thereof, and all intention on his part in any way to have violated any of the provisions of the acts of congress.

It appears that, in October, 1879, Murchie purchased in the province of Nova Scotia about 2,000 sheepskins of rather inferior quality, which had been taken from sheep and lambs slaughtered in the summer, when the fleece is not as valuable as later in the season. These skins were procured by him in various places and at various prices, and were taken across the Bay of Fundy to St. John, from whence, by rail, they were transported to St. Stephens and stored in a portion of a barn, which had been finished off for an ice house, upon the premises of one Elliot Murchie, a brother and partner of Josephus M. Murchie, and there they remained from about the middle of October until the third day of January last. These skins were all dried, and were salted with salt, which had been used in pickling fish, and were easily distinguishable from fresh skins. The city of St. Stephens is on the easterly side of the St. Croix river, and is separated from Calais, in this district, by that river; the two places are united by a bridge about 500 feet long, at the westerly end of which, on the American shore, is an office of the United States customs revenue. In January last, there was not any boat running from Calais to Eastport; but the Stroud a small propeller under the British flag, ran as a mail and ferry boat from St. Stephens with freight and passengers, making the weekly trips to Eastport, and touching on one or more of these trips at St. Andrews, Deer Isle and Grand Menan, all in British territory. On the first of January, Murchie saw the customs officers at Calais, and consulted with them as to the course to be adopted by him for getting the skins to market. He informed them where the skins were, and wanted them to go to St. Stephens and there take the account in order to estimate the duties; at first, the officers, as he swears, thought this might be done, but, on

reflection, they concluded that skins must be brought within the United States if they were to be entered; and thereupon, it was arranged that Murchie should haul the skins over to the end of the bridge where they were to be examined and the duties ascertained by the officers. On January 2nd, Murchie procured a team and hay rack, and, with the aid of one Libby, loaded up the rack with skins which were taken over the bridge and there inspected; the shearling skins, or those which had not any wool of a commercial value, were thrown one side by the direction of the inspectors; the others were counted, weighed, and the quantity of wool upon them ascertained, and they were then reloaded and taken loose, in bulk, by Libby and Murchie, to the barn from whence they had been hauled, and were there thrown out on to the floor of the barn, and were not mixed with the skins remaining in the ice house. Five loads of skins were thus dealt with; the last load was carried back to the barn late in the afternoon, but was not removed from the rack until after dark, when the skins were thrown down with all the other skins upon the barn floor. Libby and Murchie both testify that they brought away from the ice house in the last load all the skins there were in it, and that none were left behind; and they also both swear that Murchie did not return to the ice house with the last load; but, after it had crossed over to St. Stephens, Murchie left it in charge of Libby and went to his shop, which was some distance from the ice house, and was not in sight from it. A correct account was taken by the customs officers of all the wool on the skins subject to duty, and of their number, viz., 1888: but no account was kept of the shearlings which were mixed with the others and hauled back. All the skins were loose and unbaled when brought into and when taken from Calais, and the customs officers never baled, corded, or sealed any portion of them. After Murchie returned to his shop, he engaged a couple of men to bale up the skins; a portion were baled and tied up that night, and the residue the next morning, making seventy-three bales. They reported the number of bales to Murchie, who thereupon went to the Calais custom house to enter the same and pay the duties; the officers called upon him for a consular invoice, which he had not obtained; the number of shearlings by estimate was fixed at eighty-five, and the whole number was given to him by the officers as 1973. He returned to St. Stephens to the place of business of the United States consular agent, one C. H. Clark, a trader in that place. Clark was not to be found, and Murchie informed Walcott, his clerk in the store, of his business with Clark, and thereupon Walcott filled out an invoice of the skins upon a blank, on the back of which was what purports to be the invoice declaration of Murchie for entry of the same at Calais made before Clark, and verified by his formal consular certificate, purporting that

the invoice was produced before him that day by Murchie, &c., as required by the act of congress.

This invoice, so certified by Clark, was then taken by Murchie to the customs officers, but it was not satisfactory to them, as the slats ·or shearling skins were not separately entered on the invoice; Murchie thereupon returned to Walcott, informed him of the requirement of the custom house officers, and the correction was made by him on the invoice by adding eighty-five slats, and reducing, to that extent, the number of wool skins, all of which is quite apparent upon the original invoice from the erasure thereon. By this invoice, Murchie, January 3d, entered at the custom house at Calais the 1888 skins and the wool thereon, paying a duty of $396.02, and the eighty-five· slats, which were free of duty. On the same day a transit manifest was obtained by C. B. Eaton, the agent of the Stroud, from the Calais custom house for the transportation of various parcels of merchandise "by dray and boat to Eastport," among which appears entered seventy-three lots wool skins, of the value of $900, Josephus M. Murchie, Boston, consignee. Eaton, as owner of sheepskins, makes oath to the statements contained in the manifest, which does not state the number of skins as required by regulation of the department. The seventy-three bales were placed on board the Stroud on the evening of January 3d, which was Saturday, and they were carried thence to Eastport on the Monday following.

The doings of Walcott at the consular agency in St. Stephens were in open violation of all the provisions of the act of congress, relative to consular invoices; and the proceedings of the customs officers at Calais were not in compliance with the law and the regulation of the treasury department. These skins were not within the United States at the time of their entry at the custom house, but were then in New Brunswick; the number and quantity of the dutiable skins had been ascertained and were known to the customs officers, so that no detriment in this behalf was sustained by the revenue; but in one respect there was a manifest neglect of duty by· these officers, as by the regulations of the treasury department, January 5, 1875, it was provided that, when goods are to be shipped from any port of the United States in transit through the province of New Brunswick, to another port of the United States, ·such goods, wares and merchandise shall, whenever practicable, be baled, corded and sealed by said customs officers at the port of departure. It is not pretended that these skins could not easily have been baled, corded and sealed before leaving Calais, and thus have complied with the regulations; and if this had been done, the opportunity could not have arisen for any fraud upon the government, as is now claimed to have been perpetrated. It is not contended that the claimant has not paid to the government the full

amount of its duties to which it was entitled upon the 1,888 dry salted wool skins: but the libel alleges that these bales were opened and the small skins withdrawn and other large and valuable skins substituted; and it is also alleged that a large number of skins, some four or five hundred, were added to those which had passed the customs and upon which duties had been paid, so that the 1,973 skins had increased to 2,419 at the time of their reaching Eastport. The pretense that the smaller skins were withdrawn from the bundles and larger skins substituted finds no support in the testimony, and therefore requires no further remark. That there were only 1,973 skins, or thereabouts, examined by the officers at Calais, and the duties due thereon paid, and that 2,419 were found in the 73 bales when examined at Eastport is established beyond all question and is conceded by the claimant; and he presents the following explanation of this discrepancy. He testifies that on the 23d of December he purchased of one Eastman, who resided some 6 miles beyond the limit of St. Stephens, 400 wool skins which were large, fresh skins, at the rate of 76 cents, paying him therefor $305. The skins were then at Eastman's place, and he was to haul them to the ice house and there deliver them so soon as the condition of the roads would permit; that on Friday afternoon, Eastman hauled the skins and unloaded them as agreed, no other person being present, and they were, most of them, thrown by him into the ice house, some few being upon the barn floor, and that after Libby had unloaded that night the last load of skins which had been inspected and passed through the custom house, the persons employed by Murchie to bale up the skins, supposing they were to bale all there were there, baled up the Eastman skins with the others, and they were thus included in the 73 bales; and that the claimant was not informed that Eastman had delivered his lot of skins, or that they were included in the bundles, until Saturday afternoon about four o'clock, when Eastman came into his shop to purchase some groceries, and then notified him he had brought in the skins the day previous. Murchie says he at once went to the ice house and found all the skins had been included in the 73 bundles which had been hauled down to the Stroud; that not knowing what to do he went to the Calais custom house which was closed; that he then attempted to find the consular agent but without success, and at last concluded that he could accompany the goods to Eastport on the Stroud and pay the duties at that port.

The government contends that this explanation is wholly unworthy of credit, and that the Eastman skins, being of much greater value, were fraudulently bound up with the rest, with an intent and design to pass them into the country by the transit manifest as being a portion of those upon which the duties had been paid at Calais. During all this

time Elliot Murchie was absent in the woods.

The claimant took out a commission to obtain Eastman's testimony, which has been returned by the commissioner unexecuted, for the reason, as he states, that Eastman is so unwell that he cannot give his deposition. Evidence has been presented from another witness, that Eastman did haul the skins on Friday afternoon to the ice house, and Murchie swears most persistently that he was not aware that they had been delivered by Eastman until he was so informed by him on the afternoon of Saturday; that he never gave any directions that these skins should be included in these bundles, and had no reason to suppose they were so included, until he learned what Eastman had done; and the testimony of the men employed by Murchie to haul the skins, as well as that of Libby, who hauled them, rather tends to corroborate this statement of Murchie. It is however somewhat remarkable that Murchie, after he had learned that there were on board the Stroud 400 skins belonging to him on which he had paid no duty, was content merely to call at the custom house and the office of the consular agent, and finding no one at either place to afford him the requisite information, should take no further steps to ascertain where any of these officers could be found. Calais and St. Stephens are not so large cities that public officers can not easily be reached when one is really anxious to discover them; and the court here cannot but entertain very grave suspicions, whether the statement of the claimant is true in relation to this parcel of skins, but upon the whole matter, as the testimony of the claimant is positive and direct, the court is inclined to allow him the benefit of the uncertainty, and to find that these skins were not, by the authority of the claimant, included in the seventy-three bundles.

On Monday, Murchie went with the skins on the Stroud to Eastport; but he took with him no invoice or other document of any kind with which he might upon his arrival enter the skins at the custom house; his movements were anticipated by one King, an inspector of customs at Calais, whose suspicions had been aroused by the proceedings of Murchie with this property, and who went by land to Eastport, arriving there before the Stroud, and after an interview with the collector, orders were given that the skins should be counted on their arrival. Was it Murchie's intention to enter the four hundred skins and pay the duties thereon on his arrival at Eastport, or was it his purpose to get them by the custom house authorities under the transit manifest, if he could, as merchandise upon which the full duties had been paid, and, if not successful in this attempt, then, as a last resort, to enter and pay the duties thereon? The great importance of this point is quite apparent; and the government contends that from the conduct and statements of Murchie at Eastport, he did not intend to act in good faith and pay the du-

ties on his parcel of skins if he could escape from so doing. As to what took place at the wharf between Murchie and the customs officers, as well as to Murchie's statements to the collector of customs at Eastport, at the custom house, there is a very great discrepancy in the testimony of the various witnesses. When the Stroud reached Eastport, the Falmouth, on her way from St. Johns to Portland, was at the wharf, and the Stroud ran alongside and made fast in a position to transfer to the Falmouth the merchandise on board, which was destined for Boston.

From the testimony, the court can draw but one conclusion, that Murchie, after he found out there were four hundred skins more in the packages than he had entered and paid duties upon at Calais, finally concluded to let the skins come forward on the Stroud, and attempt to transfer them to the Falmouth to transport them to Boston under the false claim and pretense that they were included in the transit manifest, and were not subject to duty, but that he had paid the duties thereon.

It is claimed, that the evidence shows that Murchie had procured the funds to pay these duties, informing the party from whom he obtained the money, that he wanted it for this purpose. Testimony to that effect has been produced; but this evidence is quite consistent with an intention to evade the payment of the duties if practicable, and, if not, then to be prepared for such an emergency, if duties were required. As bearing upon the purpose and intention of Murchie, it must be remembered that he was without any invoice or consular certificate of any description upon which to make an entry, although, but a day or two previous, he had learned from the officers at Calais, that such a document was a necessity, without which, an entry under ordinary circumstances, would not be permitted, and that a failure to produce the same, when entry should be demanded if finally allowed, would necessarily occasion great delay and prevent the immediate transfer of the goods as intended. Rev. St. § 3082, declares "that if any person shall fraudulently or knowingly import or bring into the United States or assist in so doing, any merchandise contrary to law, * * * such merchandise shall be forfeited, &c." In the case of U. S. v. Thirty-Nine Trunks [Case No. 15,885], 1876, Mr. Justice Strong, of the supreme court, held "that importing goods subject to duties, without an invoice and consular certificate, and without entry in the manifest, is not such an importation as the law permits to be made." In U. S. v. Jordan [Id. 15,498], Lowell, J., referring to the opinion of Strong, J., says: "The learned judge held * * * that the goods were illegally imported, in this, that the importer had not prepared himself with the invoices necessary to their entry at the custom house, and that the statute of 1866 should be construed to include a fraud connected with the entry of the goods, or an intent not to enter them."

Viewed in the light of these decisions, the

court can not but conclude that these four hundred skins have become forfeited to the United States under the provisions of this section. They were not only without the proper documents, but the claimant endeavored to impose upon the customs officers at Eastport, by the false pretense that the duties had been paid upon them at Calais, and that they were protected by the transit manifest; and he persisted in this fraud, until he found that it would not succeed and that some other course must be adopted by him to obtain his property.

It is urged in defense that, from the character of the skins and his employment, there was no importation of these skins prior to the seizure. It is urged, that she was a provincial mail boat, employed most of the time in foreign waters, touching only at Eastport, and, therefore, the goods had not been imported into the United States; that finding the customs officers at Eastport would not admit them to entry, and they being on board the Stroud, the claimant had the privilege of retaining the goods on board of her and returning them back to the provinces.

It is a sufficient reply to this view, that whatever may be the nationality of a vessel, when she arrives within the territory of this country, she must conform to our revenue laws; and if an attempt is made to violate them, the ship and cargo must abide the consequences as declared by act of congress. Her nationality or employment does not confer immunity and justify any act or attempt to disregard the laws of this country. That the Stroud, when alongside the Falmouth, was solely within the United States, is clearly beyond question; and the merchandise on board was amenable to our laws as absolutely as if she had been a domestic ship. Any other construction would render our revenue laws wholly ineffectual; for all that a provincial smuggler would have to do, would be to place his merchandise on board a British ship, and, without invoice or document of any description, in open day, arrive in one of our harbors, makes fast to the wharf, go on shore and test the market, and finally conclude to sell and land the merchandise without payment of duties. and, upon being detected in these proceedings, would then insist on the right to leave the country, taking with him the merchandise which he had failed to put on shore.

The court does not understand that the laws of the United States, as yet, have held out such strong inducements for their violation; and these four hundred unsalted skins, purchased of Emerson, are therefore adjudged and decreed forfeited to the United States, as having been by the owner knowingly and fraudulently, and in violation of law brought into this country with the actual intention by him to thereby defraud the United States. These goods being thus adjudged forfeited, it is claimed by the government, that the residue of the skins must also be condemned. It is said that the skins were all so mixed up

by the claimant that it is impossible to distinguish the Emerson skins from the Nova Scotia lot; that there was such a confusion of goods that the one can not be separated from the other, and as the one lot has been condemned. and, by the act of the claimant or his agents, they have been thus intermixed, and he cannot select out those upon which the duty has been paid by him, they must all be decreed forfeited, as, in the case of a wilful confusion of one's own goods with another's, the whole must be taken to be the property of the latter party, unless his property can be satisfactorily distinguished. To what extent this rule, which is sometimes recognized in such cases, might be applicable in a case of this description, it is unnecessary for the court to consider, as the four hundred skins purchased of Emerson, and which are liable to forfeiture, are as easily to be selected from the dried skins as if they had been the skins of bullocks or any other animal.

It is also claimed that the 1,973 skins entered at Calais, upon which the proper duties were paid, are liable to forfeiture under the provisions of section 2864 of the Revised Statutes, and section 12, c. 391, Acts 1874 [18 Stat. 188]. Under each of these sections, it is requisite that the party, by a false invoice, or a false or fraudulent statement, or appliance or pretense, should enter or attempt to enter his merchandise. In the present instance, the attempt to enter was made at Eastport, but not until after the skins had been seized and were in the control of the officers. It is, also, not quite certain that any of the statements made by Murchie to the collector, at his office, constituted such a false or fraudulent practice or appliance, or false statement as would work a forfeiture under these provisions of law. According to the collector's testimony, Murchie did not claim in his conversation that he had paid the duties on the 400 skins, or even that it was his purpose so to do when he left St. Stephens. The substance of his statement was, that he had not paid the duties and wanted the privilege of doing so. The act of 1874 (section 12) should be construed in connection with section 2864; and, by section 12, the entire invoice in such cases is not forfeited, but only "the merchandise in the case or package containing the particular article or articles to which such fraud or alleged fraud relates." Under this section, therefore, only such packages of the dry skins as contained some of the Emerson skins, would be liable to forfeiture; and while the court has no doubt there were some packages which contained some of both parcels, the court can not now, by any possibility, determine which skins were thus baled together, as the bales have all been opened since the seizure, and their contents distributed, and no record taken to identify the contents of any particular package.

But, in the opinion of the court, there is a still more decisive and conclusive answer to this claim by the government. The act of

1874 (section 167) provides that unless the court is satisfied that there was the intent to defraud, there shall be no forfeiture of the goods. In the present instance, the government had received every dollar it was entitled to exact for duties upon this lot of skins, and therefore there could have been no intention to defraud in that particular. With all the assistance of the district attorney, the court has failed to meet with any statute which subjects this portion of the skins to forfeiture, for any matter, which has been shown to the court, and they are therefore adjudged not liable to condemnation for any violation of the revenue laws, and are ordered to be restored to the claimant; but, under the circumstances, the collector is entitled to a certificate of probable cause of seizure.

Decree accordingly.